# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

KEVIN T. SINGER,

        Plaintiff,

        v.                     Case No. 05-C-1040

MATTHEW FRANK,
PHIL KINGSTON,
GARY McCAUGHTRY,
MARC CLEMENTS,
BRUCE MURASKI,
CO McCARTHY, and
CO MASSIE,

        Defendants.

## ORDER

The plaintiff, Kevin T. Singer, who is presently incarcerated at the Waupun Correctional Institution (WCI), lodged a *pro se* civil rights complaint under 42 U.S.C. § 1983 and a motion for leave to proceed *in forma pauperis*. Subsequently, the plaintiff paid the filing fee in full and withdrew his motion for leave to proceed *in forma pauperis*. By order of January 20, 2006, the court determined that the plaintiff's complaint which contained due process, freedom of speech, and equal protection claims concerning the alleged seizure of his fantasy role-playing publications and manuscript survived screening under 28 U.S.C. § 1915A.[1]

Presently before the court are the following motions: (1) Defendants' Motion for Summary Judgment; (2) Plaintiff's Motion for Partial Summary Judgment;

---

[1] The complaint was not verified in accordance with 28 U.S.C. § 1746.

(3) Defendants' Motion to Strike Plaintiff's Motion for Partial Summary Judgment; (4) Plaintiff's Motion to Strike the Affidavit of Bruce Muraski; and (5) Plaintiff's Motion to Strike Exhibit 1010. All of these motions will be addressed herein.

## I. PLAINTIFF'S MOTIONS TO STRIKE

Plaintiff has moved to have defendants' Exhibit 1010 and the affidavit of Bruce Muraski, a security supervisor at WCI, stricken from the record. Both documents were submitted by defendants in support of their motion for summary judgment. Exhibit 1010 is a copy of an anonymous letter sent to defendant Bruce Muraski in which the author accuses plaintiff, along with three other inmates, of organizing a Dungeons and Dragons gang at WCI. This exhibit was attached to the affidavit of Mr. Muraski. The plaintiff argues that the affidavit should be stricken because it is not made on "personal knowledge." He also contends that Exhibit 1010 should be stricken because "anonymous sources are notoriously untrustworthy" and the letter has no probative value.

In general, motions to strike are disfavored. *Williams v. Jader Fuel Co.*, 944 F.2d 1388, 1405-06 (7th Cir. 1991). The party moving to strike has the burden of showing that the challenged material is "devoid of merit, unworthy of consideration, and unduly prejudicial." *E & J Gallo Winery v. Morand Bros. Beverage Co.*, 247 F. Supp. 2d 979, 982 (N.D. Ill. 2003) (internal quotation marks and citations omitted). Here, the plaintiff fails to cite to any rule or authority to support his contention that Exhibit 1010 should be stricken. He argues only that the exhibit should not be part of the record because it is not relevant to defendants' case

2

and contains overt lies. In response, the defendants maintain that the exhibit is probative because it is being offered to explain the reasons underlying the decision to confiscate the plaintiff's role-playing material in this case.

Clearly, the reasons underlying the decision to confiscate the plaintiff's role-playing materials are germane to plaintiff's free speech and equal protection claims. A claim that one's right to free speech was violated may turn on whether the regulation or policy pursuant to which the defendants acted is reasonably related to legitimate penological interests. *See Lindell v. Frank*, 377 F.3d 655, 657 (7th Cir. 2004). Further, the cause of the alleged differential treatment is relevant to the court's equal protection analysis. *See Hilton v. City of Wheeling*, 209 F.3d 1005, 1008 (7th Cir. 2000) (the plaintiff must show that the cause of the differential treatment of which the plaintiff complains was a totally illegitimate animus toward the plaintiff by the defendants). Thus, because Exhibit 1010 contains relevant evidence and the plaintiff has failed to establish that Exhibit 1010 is unduly prejudicial, the plaintiff's motion to strike the exhibit will be denied.

With respect to the affidavit of Mr. Muraski, plaintiff refers to Rule 56(e), Federal Rules of Civil Procedure, in the caption of his motion but does not discuss the applicability of that rule anywhere in his motion. Nevertheless, it appears that plaintiff is arguing that the affidavit should be stricken because Mr. Muraski is not competent to testify as to the matters stated in the affidavit. Specifically, he contends that "Mr. Muraski has never read a role-playing book nore [sic] has he ever

role-played. His experience as a gang coordinator is irrelevant because Dungeons & Dragons isn't a gang." (Pl.'s Mot. to Strike Aff. 1.)

A review of Mr. Muraski's affidavit belies the plaintiff's contentions. It is readily apparent from the affidavit that Mr. Muraski's training, education, and experience renders him qualified to assess prison security issues. Moreover, contrary to plaintiff's assertions, it appears that Mr. Muraski has read role-playing books, including some of the material confiscated from plaintiff's cell. Thus, because Mr. Muraski's testimony was based on his personal knowledge, the plaintiff's motion to strike his affidavit will be denied.

## II. DEFENDANTS' MOTION TO STRIKE PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

The defendants have asked the court to strike plaintiff's motion for partial summary judgment because it does not comply with the requirements for a summary judgment motion under Civil Local Rule 56.2(a) in that it failed to include "(1) a stipulation of facts between the parties or (2) the movant's proposed findings of facts supported by specific citations to evidentiary materials in the record or a combination of 1 and 2." (Defs'. Mot. to Strike 1-2.) The plaintiff's motion for partial summary judgment did not contain any proposed findings of fact nor was the motion accompanied by a personal affidavit. However, the plaintiff recognized this deficiency and, on February 26, 2007, he filed a document entitled "Amended Proposed Findings of Fact."[2] By order of March 19, 2007, the defendants were

_____

[2] While the document is captioned "Amended Proposed Finding of Fact," the file reveals that this is actually the only proposed findings of fact submitted by the plaintiff. Plaintiff did file a document entitled "Plaintiff's Proposed Findings of Fact" at Docket #95, but a review of that document discloses that it is really

4

permitted to file a response to the plaintiff's proposed findings of fact in accordance with Local Rule 56.2(b), which they did on March 28, 2007.

Because the plaintiff cured the deficiency inherent in his motion for partial summary judgment, the court does not believe his motion should be stricken. Therefore, the defendants' motion to strike the plaintiff's motion for partial summary judgment will be denied.

## III. SUMMARY JUDGMENT STANDARD

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *McNeal v. Macht*, 763 F. Supp. 1458, 1460-61 (E.D. Wis. 1991). "Material facts" are those facts that, under the applicable substantive law, "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material facts" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The burden of showing the needlessness of trial–(1) the absence of a genuine issue of material fact and (2) an entitlement to judgment as a matter of law–is upon the movant. However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support

plaintiff's response to the defendants' proposed findings of fact which were filed along with the defendants' motion for summary judgment.

a reasonable jury verdict. *Anderson*, 477 U.S. at 267; *see also Celotex Corp.*, 477 U.S. at 324 ("proper" summary judgment motion may be "opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves . . ."); Fed. R. Civ. P. 56(e) ("When a summary judgment motion is made and supported as provided in [Rule 56(c)], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavit or otherwise provided in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial"). "Rule 56(c) mandates the entry of summary judgment, . . . upon motion, against a party who fails to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmoving party. *Johnson v. Pelker*, 891 F.2d 136, 138 (7th Cir. 1989). "However, we are not required to draw every conceivable inference from the record – only those inferences that are reasonable." *Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir. 1991) (citation omitted).

The fact that both parties have moved for summary judgment, and thus both parties simultaneously are arguing that there is no genuine issue of fact, does not establish that a trial is unnecessary or empower the court to enter judgment as it sees fit. See 10A Charles Alan Wright, et al. § 2720 at 327-28 (3d ed. 1998). Summary judgment may be granted only if one of the moving parties is entitled to

judgment as a matter of law on the basis of the material facts not in dispute. *See*

*Mitchell v. McCarty*, 239 F.2d 721, 723 (7th Cir. 1957). Cross motions for summary

judgment do not convert a dispute into a question of law if material factual questions

are involved and additional evidence may be adduced at trial which would be helpful

in the disposition of the case. *See M. Snower & Co. v. United States*, 140 F.2d 367

(7th Cir. 1944).

The proper procedure is to assess the merits of each summary judgment

motion independently. *See* 10A Charles Alan Wright, et al. § 2720 at 335-37. Each

party, as a movant for summary judgment, bears the burden of establishing that no

genuine issue of material fact exists and that it is entitled to a judgment as a matter

of law. The fact that one party fails to satisfy that burden on its own motion does not

automatically indicate that the opposing party has satisfied its burden and must be

granted summary judgment on the other motion. *See* 10A Charles Alan Wright, et

al. § 2720 at 335.

## IV. RELEVANT UNDISPUTED FACTS

### A. Introduction

Both parties have submitted proposed findings of fact relating to their motions

for summary judgment and such submissions have been responded to in

accordance with Civil Local Rule 56.2(b) and (c).[3] In this section, the facts found to

---

[3] On February 8, 2007, after the plaintiff filed his response to the defendants' proposed finding of fact, the defendants' filed "Supplemental Defendants' Proposed Findings of Fact." Such submission is not contemplated under the local rules governing procedures in connection with motions for summary judgment, and the defendants did not seek leave of court to supplement their proposed findings of fact. Thus, because plaintiff was not provided with an opportunity to respond to these supplemental proposed findings of fact, they will not be considered by the court.

In addition, the court will not consider the publications (Dungeons & Dragons Players Handbook, Core

be undisputed based on the defendants' proposed findings of fact are set out first, followed by the undisputed facts based on plaintiff's proposed findings of fact.

## B.    Undisputed Facts from Defendants' Proposed Findings of Fact

Before setting out the relevant facts which are based upon consideration of the parties' submissions, the court notes that Civil L.R. 56.1 (E.D. Wis.) sets forth requirements for summary judgment motions in *pro se* litigation.  Specifically, Civil L.R. 56.1(a)(1) provides that when the party opposing the *pro se* litigant files a motion for summary judgment "any factual assertion in the movant's affidavit(s) or other admissible documentary evidence will be accepted by the Court as being true unless the party unrepresented by counsel submits the party's own affidavit(s) or other admissible documentary evidence contradicting the factual assertion."  Here, plaintiff attempts to dispute many of the defendants' proposed findings of fact by asserting that he "lacks the knowledge to form a belief and denies allegations contained [in the proposed finding] and puts defendants to their proof." *(See e.g.*, Pl.'s Resp. to Defs.' Proposed Findings [Pl.'s Resp. DPFF] (Docket # 97) at ¶¶ 10-17, 19, 20, 22, 25, 27, 28, 30, 35, 39, 40-42, 55, 64-66 and 76.)  This type of response does not sufficiently dispute any properly supported proposed finding of fact.  At the summary judgment stage, the plaintiff must do more than deny the proposed factual finding.  He must identify specific facts showing that there is a genuine issue for trial.  *See* Rule 56(c), Federal Rules of Civil Procedure and Civil

---

Rule Books I, II and III) which were filed as exhibits 50, 51 and 52 on June 21, 2007.  None of these publications were served on the defendants, and the exhibits were filed well after the briefing period in connection with the motions for summary judgment had expired.

Local Rule 56.2(c). Thus, any properly supported proposed finding of fact to which such a response is made will be deemed admitted. *See* Civil Local Rule 56.2(c).

With that in mind, the court finds the following facts to be undisputed. Plaintiff has been housed at WCI since April 2, 2002. (Defs.' Proposed Findings of Fact [DIF.] ¶ 2.) His first incarceration began in May 1994. *Id.* Matthew J. Frank is employed by the Wisconsin Department of Corrections (DOC) as Secretary. (DIFF. ¶ 3.) Mr. Frank was appointed as Secretary of the DOC by the Governor of the State of Wisconsin, effective January 6, 2003. *Id.* Mr. Frank has general supervisory authority of the DOC operations as provided in the Wisconsin Statutes, but he does not supervise the day-to-day operations of individual correctional institutions or staff working in the institutions. (DIFF. ¶ 4.) Phillip Kingston is employed by the DOC as the warden of WCI. (DIFF. ¶ 5.) He has held this position since December 26, 2004. *Id.*

Bruce C. Muraski is employed by the DOC, Division of Adult Institutions (DAI) as a Security Supervisor 2 at WCI. (DIFF. ¶ 6.) He has held this position since June 1992. *Id.* Mr. Muraski is also the Disruptive Group Coordinator for WCI, and he has held this position since February 1991. (DIFF. ¶ 7.)

Marc J. Massie is employed by the DOC as a Correctional Officer at WCI, and has held this position since July 16, 2001. (DIFF. ¶ 8.) In his capacity as Correctional Officer, Mr. Massie is responsible, in part, for inspecting inmates' living quarters for any violations of cleanliness or security standards, searching and

screening the personal belongings of inmates, and searching inmates for contraband. (DIFF. ¶ 9.)

The goals of the DOC include providing safe and secure correctional institutions for the public, staff and inmates, providing productive inmate programs and work activities, maintaining positive institution living and work environments, and responsibly managing human and fiscal resources. (DIFF. ¶ 10.)

1.  <u>Personal Property</u>

DOC inmates are allowed to obtain and possess personal property subject to DOC rules and the institution's policies and procedures. Allowable personal property may vary from institution to institution depending on security concerns and treatment programs. (DIFF. ¶ 11.) The DOC implements guidelines, known as Internal Management Procedures (IMP), which are to be relied upon by correctional staff in order to consistently apply the rules, policies and procedures related to individuals incarcerated in DOC correctional institutions. (DIFF. ¶ 12.) Additionally, each DOC correctional institution develops independent procedures in accordance with their specific security needs and institutional resources. *Id.* The IMP related to inmate personal property is DOC 309 IMP 1, "Subject: Inmate Personal Property." (DIFF. ¶ 13.) This IMP has been revised from time to time. *Id.* The version with an effective date of May 3, 2004, was in force on November 15, 2004. *Id.* WCI relied upon DOC 309 IMP 1 to control inmate personal property. (DIFF. ¶ 14.)

All WCI inmates receive a "Rules & Information Handbook." (DIFF. ¶ 15.) This handbook has been revised from time to time. *Id.* Although the handbook does

not cover all of the institution, rules and policies, it is the intent of the handbook to set forth a summary of the rules, policies and procedures that assist the institution and inmates in maintaining a safe and secure environment for staff and inmates. *Id.* It is the inmate's responsibility to read and know the rules of the institution. *Id.*

It is DOC's intent to facilitate inmate reading of publications, including books, magazines, newspapers, and pamphlets. (DIFF. ¶ 16.) Gang related and pornographic publications and other publications that pose a threat to institution security are not permitted in any DOC correctional institution. *Id.* Inmates cannot receive publications that teach or advocate violence or hatred and that present a danger to institution security and order. (DIFF. ¶ 17.)

Other than electronic items or musical instruments (the value of which shall not exceed $350.00), the value of individual property items shall not exceed $75.00. (DIFF. ¶ 18; Aff. of Linda Alsum-O'Donovan, Ex. 1002, p. 2; Pl.'s Resp. to DPFF ¶ 18.) This amount was established by the DAI. *Id.* The purpose of the $75.00 limitation on the value of property for which an inmate may possess is two-fold: (1) to reduce the possibilities for strong-arming–the use of physical force or coercion against others which may occur due to the prospect of gaining valuable personal property; and (2) to mitigate liability incurred by the institution when property is unintentionally lost or damaged by staff. (DPFF ¶¶ 19-20.)

All items that are not authorized for the inmate to possess as personal property are to be confiscated and staff is to complete a "Property Receipt/ Disposition" form DOC-237. (DPFF ¶ 21.) Disposition of contraband personal

property must be made within 30 days.  (DPFF ¶ 22.)  WCI does not have the space to store contraband personal property items for an undetermined period of time.  *Id.* Most importantly, it is important for the institution's security to have contraband personal property sent out of the institution in an expeditious manner.  *Id.*

The inmate has several options to dispose of contraband personal property which are set forth in the WCI Rules & Information Handbook.  (DPFF ¶ 23.)  Any costs involved in disposing of the contraband personal property is the responsibility of the inmate. *Id.*

### 2.    Disruptive Groups/Gangs

Disruptive groups (hereinafter referred to as gangs) are defined as groups of individuals who threaten, coerce, or harass others and/or engage in or encourage illegal or illicit activities on the part of group members or others.  (DPFF ¶ 24.) Gangs are a reality in the Wisconsin prison system.  *Id.*  Suppressing gang activity in the DOC correctional institutions is imperative to maintaining a safe and secure environment for staff, inmates, and the public.  (DPFF ¶ 25.)  Managing gang activity reduces the number of violent incidents in the correctional setting.  Managing gang activity is conducted through educating staff, searching inmates' living areas and monitoring telephone conversations, mail, and inmate personal property.  *Id.*

Institution security is threatened by the presence of gangs because of the direct threat of gang violence, and because gangs undermine prison authority by providing a support system for taking a stance that is in opposition to the prison administration.  (DPFF ¶ 26.)  The presence of gangs in prison is detrimental to

individual prison inmates and to the prison system as a whole. (DPFF ¶ 27.) Affiliation with gangs in the correctional setting is not in the best interest of the offender and his rehabilitation. *Id.* Gang members themselves are physically endangered by the presence of rival groups. *Id.* In addition, their chances of rehabilitation are fatally compromised, as gangs are antisocial and are frequently involved in criminal activities. *Id.*

Persons entering prison for the first time who were members of street gangs usually will affiliate with members of those gangs who are also incarcerated. (DPFF ¶ 29.) New inmates who were never affiliated with street gangs often find themselves pressured into joining a gang inside the prison, especially if the new inmate is perceived as having had power and resources on the outside. *Id.* Gangs inside the prison have ways and means of providing gang members with goods and services, such as drugs, alcohol, food, and sexual favors, as well as protection against members of other gangs. (DPFF ¶ 30.) Procuring these goods and services violates institution policies and procedures as well as state laws. *Id.*

It is Mr. Muraski's responsibility to prevent any gang activity to threaten the security of WCI, and to prevent the grouping of inmates into new gangs or any other groups that are not organized to promote educational, social, cultural, religious, recreational or other lawful leisure time activities. (DPFF ¶ 31.)

3. <u>Search of Singer's Cell in November 2004</u>

On or about November 14, 2004, Mr. Muraski received information from an anonymous source that Kevin Singer #244798 was involved with other inmates

Case 2:05-cv-01040-JPS   Filed 07/31/07   Page 13 of 47   Document 137

in starting a "Dungeons and Dragons" gang.[4]  (DPFF ¶ 32.)  The source also advised Mr. Muraski that Mr. Singer and the other inmates were attempting to recruit inmates to join the gang, and this recruitment was creating fear among some of the inmates towards Singer and others involved in the fantasy roleplaying games. (DPFF ¶ 33.)

On November 15, 2004, Mr. Muraski ordered WCI security staff to conduct searches of the cells housing Mr. Singer and several other inmates.  (DPFF ¶ 34.) The cells searched corresponded to the inmate names provided by the anonymous source.  *Id.*  The purpose of the search of the cells on November 15, 2004, was to look for contraband, and in particular any materials related to fantasy role-playing games such as Dungeons and Dragons.  (DPFF ¶ 35.)  Captain Bruce Muraski instructed Officer Massie to assist with the November 15, 2004, search of several inmates' cells, including the cell housed by Kevin T. Singer # 244798.  (DPFF ¶ 36.) Officer Massie was advised by Mr. Muraski to search for contraband items related to fantasy role-playing activities or games such as Dungeons & Dragons, and to confiscate all such materials for his investigation and inspection.  (DPFF ¶ 37.)

As a result of the November 15, 2004, search of Mr. Singer's cell, Officer Massie confiscated 21 books, 14 magazines, and miscellaneous paperwork, all of which related to fantasy role-playing activities or games such as Dungeons & Dragons.  (DPFF ¶ 38.)  On November 15, 2004, Officer Massie completed a "Property Receipt/Disposition," form DOC-237, and placed all items that were

---

[4] While plaintiff denies starting a gang or any involvement in a gang, he has not pointed to any evidence disputing the fact that Mr. Muraski received the anonymous letter.  (Pl.'s Resp. to DPFF ¶ 32.)

confiscated in Mr. Singer's cell into two paper bags and gave the materials to Captain Muraski. (DPFF ¶ 39.)

Officer Massie's search of Mr. Singer's cell on November 15, 2004, was the only involvement he had with the plaintiff or his association with fantasy role-playing activities or games. (DPFF ¶ 40.) Officer Massie did not participate or assist Mr. Muraski regarding his determination that the fantasy role-playing materials that were confiscated from Mr. Singer's cell on November 15, 2004, were contraband, and should be removed from Mr. Singer's possession and sent out of the institution pursuant to the DOC policy regarding inmate personal property. (DPFF ¶ 41.) To the best of his recollection, Officer Massie had no involvement at any time with the review or processing of Mr. Singer's mail, including any decisions to allow fantasy role-playing materials, which were mailed into the institution and delivered to Mr. Singer. (DPFF ¶ 42.)

Mr. Muraski reviewed each item confiscated from Mr. Singer's cell on November 15, 2004, and found them all to be related to the Dungeons and Dragons role-playing fantasy game. (DPFF ¶ 43.) Based upon his review and investigation, Mr. Muraski determined that the magazines, books, and other materials confiscated from Mr. Singer's cell on November 15, 2004, would not be allowed to be retained in the institution. (DPFF ¶ 44.) Mr. Muraski advised Mr. Singer to notify the property room of the manner in which to dispose of the property. (DPFF ¶ 45.)

4.      Disposition of Mr. Singer's Personal Property Confiscated from
        His Cell Search in November 2004

On or about December 14 and 15, 2004, Mr. Singer signed a "Disbursement Request" form DOC-184 which authorized payments from his inmate account to have all of the materials confiscated from his cell on November 15, 2004, mailed out of the institution.  (DPFF ¶ 46; Pl.'s Resp. to DPFF ¶ 46.)  The WCI Property Room would have confirmed with Mr. Singer the mailing address to which the non-allowable property was to be sent.  (DPFF ¶ 46.)  When an inmate has not arranged for the disposition of non-allowable property, DOC 309 IMP 1 requires that the property be stored in the institution's property department for 30 days before it is disposed of in accordance with Wisconsin Administrative Code DOC 309.20(4)(d). (DPFF ¶ 47.)

5.      Dungeons & Dragons

Dungeons & Dragons is a fantasy role-playing game.  (DPFF ¶ 48.)  Such materials never have been officially allowable personal property at WCI.  *Id.* However, prior to November 15, 2004, role-playing publications ordered by plaintiff were delivered to him at WCI. [5]  (Pl.'s Resp. to DPFF ¶ 48.)

_____

[5] In addition to citing to his affidavit to support this assertion, plaintiff cites to exhibits 1 and 2.  These exhibits are not attached to his affidavit or to his response to Defendants' Proposed Findings of Fact.  The court's independent review of the voluminous file in this case did not uncover any such exhibit.  However, it appears from a document marked as "Exhibit Sheet" which was filed by plaintiff on February 14, 2007 (Docket #94), that exhibits 1 and 2 are really the property receipts designated as exhibits A and B which are attached to the complaint.  According to the Exhibit Sheet, plaintiff has changed the labeling system of his documents so that exhibits which were previously given a letter designation such as "A" and "B" will now be referred to numerically such as exhibits "1" and "2."

In considering a motion for summary judgment, the court is not required to scour the record in search of evidence to defeat the motion; the nonmoving party must identify with reasonable particularity the evidence upon which the party relies.  *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007) (citing *Johnson v. Cambridge Industries, Inc.*, 325 F.3d 892, 898 (7th Cir. 2003)).  While the court was able to locate exhibits 1 and 2 to which plaintiff referred, his confusing labeling system is contrary to his obligation to identify the evidence upon which he relies with "reasonable particularity."

Mr. Muraski has security-related concerns with inmates participating in Dungeons & Dragons activities, in part, because the rules of the game include providing one person, known as the "Dungeon Master" with a leadership role to master the game rules and control the course of the game.[6] (DPFF ¶ 49.) The Dungeon Master narrates and referees the elements of the game and gives directions to other players.[7] Although plaintiff denies that the Dungeon Master has control over "subordinate" players, he did not dispute the defendants' proposed finding that the responsibilities of the Dungeon Master mimics the organization of a gang, where one person is the leader of a group of persons and has some level of authority over others. (DPFF ¶ 50; Pl.'s Resp. to DPFF ¶ 50; Defs.' Reply to Pl.'s Resp. ¶ 50.)

Any inmate activity or group that has the potential of creating a gang mentality among its participants must be prohibited to protect the security of the correctional institution, its staff and community. (DPFF ¶ 51.) Dungeons & Dragons has the potential to promote gang mentality among its participants.[8] (DPFF ¶ 52.) Inmates

---

[6] Plaintiff challenges the defendants' representation of the Dungeon Master as a "leader" by presenting the testimony of Byron Cibrario, a former WCI inmate and Dungeons & Dragons enthusiast. However, Mr. Cibrario's testimony that the Dungeon Master "starts the story by providing a starting point and/or conditions for the characters to begin their journey" and that it is the Dungeon Master's role to "develop the general theme of the story even the moral of the story" actually supports Mr. Muraski's testimony that the Dungeon Master acts as a leader in the game.

[7] The testimony provided by the parties shows that there is a dispute concerning whether the Dungeon Master has control over the other players or "subordinates" in the game. Mr. Muraski has testified that the Dungeon Master "gives directions to other players who are his subordinates. (Affidavit of Bruce Muraski ¶ 30.) On the other hand, Mr. Cibrario has testified that the Dungeon Master acts as a "rules judge" but "no one exerts control over other players . . . ." (Affidavit of Byron Cibrario ¶ 4.)

[8] Plaintiff denies that Dungeons & Dragons promotes gang activity but cites no evidentiary material to support his blanket denial. (Pl.'s Resp. DPFF ¶ 52.) Moreover, the plaintiff has not laid any foundation to establish his ability to give an opinion about gang mentality or gang organizations.

17

will attempt to form a gang under the guise of a seemingly harmless activity, such as a game, hobby, religious affiliation, etc. *Id.* One aspect of the Dungeons & Dragons game is to evade and escape from made-up situations that can lead to an inmate's obsession with escaping from the correctional environment. (DPFF ¶ 53.) This type of game has been found to promote competitive hostility, violence and addictive escape behavior, which can compromise not only the inmate's rehabilitation and effects of positive programming, but also endanger the public and jeopardize the safety and security of the institution.[9] *Id.*

Mr. Muraski is not aware of a DOC DAI directive regarding Dungeons & Dragons or other role-playing fantasy games, but many DOC institutions ban inmates' participation in these types of activities due to the dangerousness of gang-related activities, including violence toward other inmates and staff.[10] (DPFF ¶ 54.)

---

[9] Plaintiff responds to DPFF ¶ 52 by stating that "to his knowledge no hobby has ever been used as a guise for criminal gang; that's ridiculous" and to the factual assertions in DPFF ¶ 53 as "absurd." (Pl.'s Resp. to DPFF ¶¶ 52 and 53.) His assertions do not sufficiently call the defendants' properly supported factual propositions into question since plaintiff is not qualified to testify to issues relating to gangs. Further, he cites to Exhibits 17-27, which are books on the topic of fantasy role-playing games, but he fails to explain how these exhibits support his assertions.

[10] Plaintiff attempts to dispute this finding by asserting that many institutions allow Dungeons & Dragons and role-playing publications. As evidentiary support for this proposition, the plaintiff points to Exhibit 1010 and Exhibit 28. Exhibit 1010 is the letter from the anonymous source received by Mr. Muraski and the court does not see how that exhibit supports his contention. In fact, the statement in the letter that Dungeons & Dragons is "not allowed at any other institution due to this problem of a gang" actually undercuts plaintiff's statement. Moreover, Exhibit 28, a "letter from Folsom" could not be located in the record. (The court did find an envelop from Folsom State Prison attached to a handwritten, lengthy document entitled "Arcstone Campaign Setting" which was docketed as document # 56 and a notation from a lieutenant at the Folsom State Prison in response to a survey which was attached to a document docketed as document # 48.) That is irrelevant, however, because information regarding the policies in place at Folsom State Prison in California is not germane to the practices at Wisconsin DOC institutions. Thus, the plaintiff has not sufficiently called into question the factual finding identified by defendants at DPFF ¶ 54.

Mr. Muraski reviewed the "Property Receipt / Disposition" forms DOC-237 that are in the files maintained by WCI related to Mr. Singer's receipt of property, dated May 11, 2002, through November 15, 2004. (DPFF ¶ 55.) The form DOC-237 is completed by staff when property is received by inmates. *Id.* Based upon Mr. Muraski's review, it appears that Mr. Singer received property items related to the Dungeons & Dragons role-playing game, which were reviewed by WCI mailroom staff and were delivered to Mr. Singer. (DPFF ¶ 56.) Due to the high volume of mail that comes into WCI for inmates and staff, it is impossible to catch every single publication or piece of mail that should be considered contraband. *Id.* Not all staff have training and expertise in identifying unsanctioned, non-allowed materials. *Id.* Not all property or mailroom staff have the level of knowledge to recognize role-playing or fantasy game materials. (DPFF ¶ 57.) Just because a publication or other property is delivered to an inmate based on a staff member's cursory review, does not necessarily mean that the inmate will be able to retain that property item if it is later determined to be contraband. *Id.*

On or about December 21, 2004, a daily bulletin was posted for all inmates and staff which provided as follows:

> Inmates are not allowed to engage in or possess written or printed materials that details the rules, codes, rosters and dogma of fantasy games & activities. Examples would be "Dungeons and Dragons", "Fantasy Sports Games" etc. These activities may create a risk of serious disruption to the institution or community.

(DPFF ¶ 58.) This bulletin clarified WCI's policy relating to fantasy games and activities. *Id.* At no time during Mr. Muraski's employment at WCI has it been the

policy of WCI to allow inmates to receive and possess role-playing or fantasy game materials, or to participate in activities related to role-playing or fantasy games even though such publications were at times delivered to the inmates by property or mailroom staff. (DPFF ¶ 59; Pl.'s Resp to DPFF ¶ 59.)

In order to maintain a safe environment for inmates and staff, WCI security staff have an obligation to correct any mistakes that are made in the delivery of personal property when the mistakes become known to the staff.[11] (DPFF ¶ 60.) It is the stated policy that no inmate at WCI presently is allowed to engage in or possess written or printed materials that detail the rules, codes, rosters, and dogma of fantasy games and activities, such as Dungeons & Dragons or fantasy sports games although plaintiff maintains that the policy is not being uniformly applied. (DPFF ¶ 61; Resp. to DPFF ¶ 61.) If any WCI inmate was found to have role-playing or fantasy game materials in his possession, it would be confiscated and considered contraband.[12] (DPFF ¶ 62.)

---

[11] Plaintiff denies the accuracy of this factual finding by stating that "the publications were approved as a policy there was no mistake made." (Pl.'s Resp. DPFF ¶ 60.) However, the evidence he relies on to substantiate his assertion (property receipt forms and the Affidavit of Richard Winters) show only that, prior to November 15, 2004, role-playing publications were delivered to him and to Mr. Winters. Neither of these submissions shows that there was a policy in existence prior to November 15, 2004, which allowed inmates to receive such publications. Thus, plaintiff has not presented evidence which creates a dispute concerning this factual finding.

[12] Again, plaintiff's evidence (Affidavit of James Livingston ¶¶ 2-4 , Docket # 52) pertaining to the practices at Green Bay Correctional Institution, Douglas County Jail, Bowie County Jail in Texas and Columbia Correctional Institution does not create a genuine issue as to what occurs at WCI. In addition, plaintiff argues that this rule regarding the confiscation of contraband applies only to a select few. He points to various exhibits attached to his complaint which are copies of excerpts from books or publications held by the WCI library. Thus, it appears that plaintiff is arguing that there is disparate treatment in the enforcement of the confiscation rules because the library at WCI contains books with maps similar to the one that was confiscated from him and magazines (eg., Sporting News) with information concerning fantasy football and fantasy basketball while his role-playing publications were confiscated. The problem with the plaintiff's assertion is that, even if the library has such information, that does not create a genuine issue as to WCI's practice of confiscating role-playing or fantasy game materials possessed by other inmates.

6. <u>Offender Complaint WCI-2004-39383 by Mr. Singer</u>

On December 14, 2004, the WCI Inmate Complaint Examiner office received an offender complaint signed by Mr. Singer and three other inmates. (DPFF ¶ 63.) This group offender complaint was filed under the Inmate Complaint Review System set forth in Wisconsin Administrative Code Chapter DOC 310.10, and assigned Group Complaint Number WCI-2004-39383. *Id.* The Inmate Complaint Examiner, Linda Alsum O'Donovan, conducted an investigation to determine the facts related to Group Complaint Number WCI-2004-39383, which related to the confiscation of Dungeons & Dragons materials on November 15, 2004. (DPFF ¶ 64.)

On December 23, 2004, Ms. Alsum O'Donovan signed an "ICE Report," and recommended that Group Complaint Number WCI-2004-39383 be dismissed. (DPFF ¶ 65.) In her ICE Report, Ms. Alsum O'Donovan noted that one of the inmates included in the Group Complaint Number WCI-2004-39383, did not have any materials confiscated during the search of cells conducted on November 14, 2004. (DPFF ¶ 66.) Ms. Alsum O'Donovan was not aware if his cell was searched on that date. *Id.* Therefore, in her report, she questioned why this inmate was involved in this group complaint; nevertheless, she left him on as a part of the group complaint so that he would be aware of the WCI's policy related to Dungeons & Dragons materials. *Id.* If any Dungeons & Dragons materials were found in this inmate's cell on November 14, 2004, those materials would have been confiscated. *Id.*

7.    Defendant Kingston

In his complaint, Mr. Singer alleges that he ordered books from "The Hit Point" in June 2002.  (DPFF ¶ 67.)  Mr. Singer further alleges that between June 2002 and November 2004, he ordered books from various bookstores, and all of these orders contained books or publications related to role-playing.  *Id.*  Mr. Kingston was not the warden at WCI during this time period, therefore, he had no involvement in the receipt or review of the publications sent into the institution for Mr. Singer.  *Id.*  Even if he had been warden during this time period, it would not have been his duty to process mail or review mail as it came into the institution for Mr. Singer or any other inmate.[13] *Id.*

In his complaint, Mr. Singer alleges that on November 15, 2004, his cell was searched and various books, magazines and other materials were confiscated.  (DPFF ¶ 68.)  Mr. Kingston was not warden at WCI on November 15, 2004, therefore, he had no involvement in the search of Singer's cell or in the confiscation of materials based on that search.  *Id.*  In addition, Mr. Singer contends in his complaint that on December 17, 2004, the confiscated materials were shipped out of the institution at his expense.  (DPFF ¶ 69.)  Mr. Kingston was not warden at WCI on December 17, 2004, therefore, he had no involvement in the determination to send materials out of the institution.  *Id.*  Even if he had been warden during this time

---

[13] The plaintiff maintains that exhibit 32 shows that Mr. Kingston "does from time to time take a direct interest in screening publications."  The court was unable to locate any document marked as exhibit 32 in the record.  Further, the plaintiff presents no evidence to counter the defendants' proof that Mr. Kingston was not the warden during the relevant time period and did not screen the publications sent into WCI for Mr. Singer.

period, it would not have been his duty to determine the disposition of items deemed to be contraband. *Id.*

According to DOC policies, the inmate has the control over how to dispose of property that is determined to be contraband and not allowable property. (DPFF ¶ 70.) Mr. Muraski has testified that there is a potential for problematic behavior among inmates who associate with role playing games, such as Dungeons & Dragons, including the potential for gang formations, and therefore, role-playing games are not allowed at WCI.[14] (DPFF ¶ 71.)

8.  <u>Defendant Frank</u>

At no time has Mr. Frank had any personal contact with Kevin T. Singer # 244798. (DPFF ¶ 72.) In his capacity as DOC Secretary, Mr. Frank had no involvement in the determination to search Singer's cell on November 15, 2004, nor did he have any involvement in the determination to confiscate materials in his personal possession on that same date.[15] (DPFF ¶ 73.) In his capacity as the Secretary of DOC, Mr. Frank had no involvement in WCI's determination to prohibit inmates from possessing written or printed materials related to role-playing or fantasy games such as Dungeons & Dragons. (DIFF. ¶ 74.) Although Wis. Admin.

---

[14] In response to this proposed finding, plaintiff asserts that "gangs are incompatible with role-playing" and that "this is the first time D&D has ever been called a gang, it's zany" and points to his own affidavit and others which aver that Dungeons & Dragons does not promote violence or gang type activity and that there have been no disturbances at WCI involving that role-playing game. While plaintiff is not an expert on gangs or security issues in the prison setting, he and the other affiants are entitled to testify as to their own experiences and the court will consider their testimony only in that regard.

[15] Plaintiff's attempt to create a genuine dispute concerning this finding by pointing to various allegations in his complaint is unsuccessful because the complaint was not verified in accordance with 28 U.S.C. § 1746.

Code § 310.14 gives the DOC Secretary authority to make a decision on offender complaints filed by inmates under the Inmate Complaint Review System (ICRS), Mr. Frank designated those duties to his Deputy Secretary. (DIFF. ¶ 75.) Mr. Frank had no involvement in any offender complaints filed by Mr. Singer under the ICRS related to the prohibition and/or confiscation of role-playing or fantasy games such as Dungeons & Dragons. (DIFF. ¶ 76.)

## C.    Undisputed Facts from Plaintiff's Proposed Findings of Fact[16]

Plaintiff asserts that, prior to November 15, 2004, WCI had a policy of allowing inmates to purchase, receive and possess role-playing publications as demonstrated by the fact that Mr. Singer and other inmates (James Livingston, Richard Winters and Scott Kieson) received property items related to Dungeons & Dragons or other role-playing fantasy games after such items were reviewed by WCI mailroom staff. (Plaintiff's Proposed Findings of Fact [PPFF] ¶ 2.) Defendants acknowledge that Mr. Singer and other inmates may have had such publications delivered to them prior to November 15, 2004, but they provide the uncontested testimony of Mr. Muraski to establish that the delivery of such materials was in error. (Defendants' Response to PPFF [Defs.' Resp. PPFF] ¶ 2; DIFF. ¶¶ 7, 48, 56-57, 59-60.) Mr. Muraski also testified that due to the high volume of mail that comes into

---

[16] Some of the proposed findings of fact identified by the plaintiff are duplicative of factual findings that have already been found to be undisputed in connection with the defendants' proposed findings of fact. In such instances, the court will not include such findings in this section. *See e.g.*, DIFF. ¶ 2 and PPFF ¶ 1; PDFF ¶ 38 and PPFF ¶ 4; and DIFF. ¶ 36 and PPFF ¶ 5. In addition, proposed findings of fact that are not properly supported by reference to admissible evidence or consist of nothing more than legal conclusions will not be included in this section, nor will any proposed finding of fact concerning the constitutionality of Wisconsin Administrative Code § DOC 309.05, as plaintiff was not allowed to proceed on such a claim. *See Singer v. Frank*, 05-CV-1040 (E.D. Wis. Jan. 20, 2006)

WCI for inmates and staff, it is impossible to catch every single publication or piece of mail that should be considered contraband. *Id.* He attests that not all staff have training and expertise in identifying unsanctioned, non-allowed materials, and just because a publication or other property is delivered to an inmate based on staff's cursory review, does not necessarily mean that the inmate will be able to retain that property item if it is later determined to be contraband. *Id.* He further states that WCI security staff have an obligation to correct any mistakes that had been made in the delivery of personal property, when the mistake becomes known to staff in order to maintain a safe environment for inmates and staff. *Id.*

To anyone's knowledge role-playing has never caused a disturbance at WCI or elsewhere in the Wisconsin DOC.[17] (PPFF ¶ 3.) Plaintiff has provided his own affidavit and the affidavits of fellow role-playing game enthusiasts, some of whom are fellow inmates, opining that Dungeons & Dragons and other role playing games do not promote violence, disruptive behavior or other gang-like activity.[18] (PPFF ¶ 6.)

---

[17] While the defendants do not point to any instances which call into question this factual finding, they add that the reason for the ban on inmate participation in fantasy role-playing activities and the prohibition against possessing related publications is based on the fact that such activities and publications "have the *potential* to promote gang mentality" and gang activity. *See* Defs.' Resp PPFF ¶ 3; DIFF. ¶¶ 52-54) (emphasis added).

[18] While AFFIANT are permitted to testify to their own personal experiences with Dungeons & Dragons, the court recognizes that these persons are not qualified as gang experts nor are they knowledgeable about the history of gang activity at WCI. Moreover, defendants object to this proposed factual finding because it relies on exhibits 17-27 and 37 which were not served upon them in accordance with Rule 5(a), Federal Rules of Civil Procedure. The plaintiff admits that he did not serve defendants with these exhibits (various fantasy role-playing books and plaintiff's manuscript) but argues that his inability to do so stems from the fact that he has been denied the right to possess these books. This controversy is of no significance. Here, the plaintiff did not cite to any material in the publications or the manuscript that supports his proposed factual finding and the court is not required to read all of the publications (some of which are over 150 pages long) or the manuscript in search of evidence to support the plaintiff's contention that Dungeon & Dragons does not advocate gang-like behavior or activities. *See Hemsworth*, 476 F.3d at 490.

The plaintiff suggests that the role-playing ban does not apply to everyone at WCI as evidenced by the fact that James Livingston, a fellow inmate at WCI, retained numerous role-playing publications after the publications policy was changed.[19] (PPFF ¶ 9.)

## V. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### A. Fourteenth Amendment Due Process Claim

The plaintiff was allowed to proceed on a claim that the seizure of his publications and manuscript on November 15, 2004, violated his due process rights under the Fourteenth Amendment. The defendants argue that such claim is without merit because the plaintiff had no inherent or absolute interest in his personal property while incarcerated, and he received all the process to which he was constitutionally entitled.

The Fourteenth Amendment prohibits states and state actors from depriving persons of life, liberty, or property without due process of law. U.S. Const. Amend. XIV. Property interests protected under the Due Process Clause are not created by the Constitution. *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972). Such interests are created from an independent source such as state law which provides a "legitimate claim of entitlement." *Id. (*"[t]o have a property interest . . . a person clearly must have more than an abstract need or desire"); *Scott v. Village of Kewaskum*, 786 F.2d 338, 339 (7th Cir. 1986). According to the Court of Appeals

---

[19] Defendants object to the plaintiff's reliance on exhibits 10, and 14-16 because they were not served with copies of these exhibits. (Defs.' Resp. PPFF ¶ 9) However, it appears that the defendants had received copies of these exhibits previously as they were attached to plaintiff's complaint as exhibits Q, J, K and L. (Plaintiff's Reply to Defs.' Resp. PPFF ¶ 9.)

for the Seventh Circuit, property is that which is "securely and durably yours under . . . law, as distinct from what you hold subject to so many conditions as to make your interest meager, transitory or uncertain." *Reed v. Village of Shorewood*, 704 F.2d 943, 948 (7th Cir. 1983); *see also Escobar v. Landwehr*, 837 F. Supp. 284, 288 (W.D. Wis. 1993).

Because the Constitution is not a source of property interests, a plaintiff must point to a state law or other independent source of law that creates the entitlement. *Thornton v. Barnes*, 890 F.2d 1380, 1386 (7th Cir. 1989). "When state law vests permission to possess or obtain certain property in an official's discretion rather than the application of concrete rules, 'there is no property interest.'" *Escobar*, 837 F. Supp. at 288 (citing *Scott*, 786 F.2d at 340).

The plaintiff argues that the WCI Rules and Information Handbook and Wis. Admin. Code § DOC 309.05(1) provide him with "statutory entitlement to the property seized." (Pl.'s Br. in Rebuttal of Defs'. Mot. for Summ. J. 4.) Specifically, the plaintiff points to page 8 of the WCI Rules and Information Handbook which provides that "an inmate may possess a total of 25 publications to include books, magazines, newspapers, periodicals, and all other publications." In addition, pursuant to Wis. Admin. Code § DOC 309.05(1) "[t]he department shall facilitate inmate reading of publications, including books, magazines, newspapers, and pamphlets."

Neither of these regulations creates a legitimate claim of entitlement to possess the type of publications and manuscripts that were seized from the plaintiff.

Indeed, by its very language, § DOC 309.05 provides that an inmate's ability to possess any publication is not an unqualified one. That regulation provides that the department shall restrict the receipt of publications in accordance with § DOC 309.05(2)(b) which lists the types of publications that an inmate is not permitted to receive, including those that the department believes "present a danger to institutional security and order." Wis. Admin. Code § DOC 309.05(2)(b)1.

Moreover, both the prisoner handbook and Wis. Admin. Code § DOC 309.05 must be read in conjunction with Wis. Admin. Code § 309.20 which governs prisoner's personal property in general. This regulation provides, in relevant part:

DOC 309.20 Personal property. (1) POLICY. The department shall permit inmates to have personal property in their possession in an institution subject to this section and the policies and procedures established under this section by the administrator or by the warden, relating to the acquisition, possession, use and disposal of inmate property.

(2) INVENTORY. Each institution shall monitor and control authorized property in an inmate's possession. A written inventory shall be maintained of all authorized personal property in an inmate's possession. An inmate is responsible for notifying the institution property department immediately if a discrepancy exists between the inventory and the property in the inmate's possession.

(3) ACQUISITION, POSSESSION AND USE. Each warden shall develop policies and procedures subject to the approval of the administrator, relating to the acquisition, possession and use of the personal property of inmates within the institution, and including the following components:

(a) A written list of the personal property items permitted at the institution. The list and any changes to it shall be approved by the administrator of the division of adult institutions.

28

Wis. Admin. Code § DOC 309.20. This regulation expressly provides that approved property lists are subject to change within the discretion of the institution subject to the approval of the Administrator of DOC's Bureau of Adult Institutions. *See* Wis. Admin. Code § DOC 309.20(2) and (3).

In determining whether plaintiff had a property right in this case, the decision in *Escobar v. Landwehr* is instructive because it involved a claim by an inmate that he had a protected property interest created by Wis. Admin. Code § DOC 309.35 (the predecessor to Wis. Admin. Code § DOC 309.20) in keeping certain personal property including a crucifix, an extension cord, various publications and two televison antennas. *Escobar*, 837 F. Supp at 287. The district court determined that this regulation did not create a property right because the rule stated that an inmate's permission to have a given item existed only to the extent that an institution's policy granted it, and that the list of allowed personal property was subject to frequent revision. *Id.* at 289. According to the district court, there is no property right in an item when the determination as to whether an individual may have possession of it is left solely to the discretion of officials. *Id.*

Like its predecessor, § DOC 309.20 leaves officials with the discretion to decide whether an inmate may have possession of a given item. The regulation specifically provides that approved property lists are subject to change with approval of the administrator of the division of adult institutions. Wis. Admin. Code § DOC 309.20(3)(a). In addition, this regulation provides that inmates are permitted to have personal property in their possession subject to the policies and procedures

established by the administrator or warden. *See* Wis. Admin. Code § 309.20(1).

Furthermore, the Wisconsin Court of Appeals has held that "prison administrative rules are not enacted for the benefit of individual inmates and do not create in them any liberty or property interests." *Richards v. Cullen*, 152 Wis. 2d 710, 713, 449 N.W. 2d 318, 319 (Wis. Ct. App. 1989).

The plaintiff also appears to be arguing that he believed that he would be allowed to retain the role playing materials because they had been delivered to him by the mail staff without incident and other inmates had previously received similar publications that they ordered. However, "[m]ere desire or expectation . . . falls short of a constitutionally protected property interest." *Escobar*, 837 F. Supp at 289 (citing *Cohen v. City of Des Plaines*, 742 F. Supp. 458, 470 (N.D. Ill. 1990), *rev'd on other grounds*, 8 F. 3d 484 (7th Cir. 1993)).

While the plaintiff has not pointed to a state law or other independent source of law that creates an entitlement to the material that was confiscated, the court is reluctant to hold that he did not have a property interest in such material in light of the finding by the Court of Appeals for the Seventh Circuit in *Caldwell v. Miller*, 790 F.2d 589, 608 (7th Cir. 1986), that an inmate had a property interest in hardbound books that were seized from his cell. Unfortunately, the appellate court did not identify the source of that property right, but stated only that "[i]t is beyond dispute that [the inmate] had a property interest in his hardbound books." *Id.*

Nevertheless, even if the plaintiff has a property right in his confiscated material, his Fourteenth Amendment claim fails because he received all the process

Case 2:05-cv-01040-JPS   Filed 07/31/07   Page 30 of 47   Document 137

that he was due under the Constitution.   Prisoners do retain a right against intentional, unauthorized deprivations of their property.  *Hudson v. Palmer*, 468 U.S. 517, 530 (1984). State action depriving an individual of a constitutionally protected property interest is not in itself unconstitutional unless the deprivation occurs without due process of law.  *Zinermon v. Burch*, 494 U.S. 113, 125 (1990).  Typically, the Constitution requires some kind of hearing before an individual may be deprived of property.  *Id.* at 127.   However, the availability of a meaningful postdeprivation remedy for the loss is sometimes sufficient to fulfill the procedural due process requirement.  *Hudson*, 468 U.S. at 532-33.  The United States Supreme Court has concluded that a predeprivation hearing is not necessary if the state cannot feasibly hold such a hearing, the state is unable to anticipate and prevent a random deprivation of a protected interest, or a hearing would place an undue burden upon the state.  *Zinermon*, 494 U.S. at 132.

It is clearly established that the rights of an inmate "may be diminished by the needs and exigencies of the institutional environment" and due process rights "must be accommodated to the legitimate security needs of a corrections institution." *Caldwell,* 790 F.2d at 608-09 (quoting *Wolff v. McDonnell*, 418 U.S. 539, 555 (1974)).  The Court of Appeals for the Seventh Circuit has noted that to provide an inmate with advance notice or a predeprivation hearing before confiscating his property would defeat the very purpose of a shakedown.  *Caldwell*, 790 F.2d at 609; *see also Overbaugh v. Caspari*, 910 F.2d 526, 527 (8th Cir. 1990) (per curiam) (prisoner's due process rights were not violated where he had adequate state

postdeprivation remedies for the destruction of his personal property after it was seized during a routine room search); *Smith v. Maschner*, 899 F.2d 940, 943 (10th Cir. 1990) (prisoner's due process rights were not violated where adequate postdeprivation remedies existed to compensate for the loss). Based on the above, the court finds that the plaintiff was not entitled to a predeprivation hearing or to notice in advance of the confiscation of his property.

Furthermore, the court concludes that the plaintiff's postdeprivation remedies are constitutionally adequate to remedy his alleged property loss. The Inmate Complaint Review System (ICRS) was available to plaintiff to complain about the confiscation of his publications and manuscript on November 15, 2004. *See* Wis. Admin. Code § DOC 310.01(2)(a), (h). The plaintiff argues that the ICRS offered no remedy because his property had already been mailed out of the institution so the issue was moot. That argument is without merit because the plaintiff could have filed an offender complaint earlier than he did. Under Wis. Admin. Code § DOC 310.09(6), the plaintiff was directed to file an offender complaint within 14 days of November 15, 2004, when his material was confiscated, in order to challenge that action. The plaintiff did not file an offender complaint within this time period and, had he done so, the ICRS could have reviewed the merits of his claim before the 30-day requirement to mail out his property. Plaintiff's decision to wait to file an offender complaint until after he arranged to mail out the confiscated items undermines his claim that he received no process.

In addition, Wisconsin law provides tort remedies to individuals like the plaintiff whose property has been converted or damaged by another which also provides a constitutionally adequate postdeprivation remedy to redress the plaintiff's property loss based on the defendants' alleged misconduct. *See* Wis. Stat. §§ 893.34; *Hamlin v. Vaudenberg*, 95 F.3d 580, 585 (7th Cir. 1996) (holding that Wisconsin's postdeprivation procedures are adequate, albeit in a different context). A certiorari action was also available to plaintiff in the state court if he was unsatisfied with the prison's decision in WCI-2004-39383 regarding the confiscation of his Dungeons & Dragons and other role-playing materials.[20] *See Duenas v. Nagle*, 765 F. Supp. 1393, 1400 (W.D. Wis. 1991).

In sum, the defendants are entitled to summary judgment on the plaintiff's Fourteenth Amendment due process claim because the plaintiff received all the process he was due under the constitution with respect to the confiscation of his role-playing publications and manuscript.

## B. First Amendment Free Expression and Freedom of the Press Claim

The plaintiff claims that the seizure of his role-playing publications and his unfinished manuscript violated his rights to freedom of speech and freedom of the

---

[20]Although plaintiff would not be able to recover damages through certiorari review, this does not render the method "inadequate" for purposes of *Parratt. See Easter House v. Felder*, 910 F.2d 1387, 1406 (7th Cir. 1990) ("the fact that an injured party 'might not be able to recover . . . the full amount which he might receive in a § 1983 action is not ... determinative of the adequacy of the state remedies' ") (citing *Hudson*, 468 U.S. at 535; *Parratt*, 451 U.S. at 544). It is also true that plaintiff can no longer pursue a writ of certiorari, because the six-month statute of limitations has expired. *State ex rel. Enk v. Mentkowski*, 76 Wis.2d 565, 252 N.W.2d 28 (1977). However, the state provided plaintiff with the opportunity of instituting such an action. Because the procedure was in existence at the time of plaintiff's loss, the state provided due process sufficient to protect his interests. *See Parratt*, 451 U.S. at 543-44.

press under the First Amendment. The defendants argue that they are entitled to summary judgment on these claims because the policy pursuant to which the defendants acted is rationally related to legitimate governmental objectives.[21]

"A prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Johnson v. California*, 543 U.S. 499, 510, (2005) (citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974)). To determine whether a prison regulation violates a prisoner's First Amendment rights, the court must determine whether the regulation is " 'reasonably related' to legitimate penological objectives." *Turner v. Safley*, 482 U.S. 78, 87 (1987) (citation omitted). In making this determination, there are four relevant factors: (1) whether there is a rational relationship between the regulation and the legitimate governmental objective advanced by the regulation; (2) whether there are alternative means of exercising the right that remain open to prison inmates; (3) the impact that accommodation of the asserted constitutional right will have on others in the prison such as prison staff, other inmates and the allocation of prison resources generally; and (4) whether there are obvious, easy alternatives such that the regulation in question is an exaggerated response to prison concerns. *Turner*, 482 U.S. at 89-90. The burden, moreover, is not on the defendants to prove the validity of the prison regulation or policy but on

_____

[21] In their reply brief, the defendants make the statement that "it does not appear that the plaintiff is arguing that the prison's policy is unconstitutional" but rather his claim is whether the defendants' conduct was consistent with the policy. The court believes that the defendants' characterization of the plaintiff's claim is too narrow. As I read plaintiff's complaint, he is asserting that the policy banning Dungeons & Dragons and other role-playing fantasy games is itself improper. This distinction is of no consequence, however, since the defendants proceeded to address the constitutionality of the policy under the applicable standard set forth by the United States Supreme Court in *Turner v. Safley*, 482 U.S. 78, 89 (1987).

the prisoner to disprove it. *See Shaw v. Murphy*, 532 U.S. 223, 232 (2001); *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 350 (1987); *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 128 (1977). The plaintiff has failed to do so here.

It is undisputed that, when the plaintiff's material was confiscated, there was no written policy prohibiting Dungeons & Dragons or other role-playing fantasy games, but many DOC institutions banned inmates' participation in those types of activities due to the dangerousness of gang-related activities, including violence toward other inmates and staff. (DIFF. ¶ 54.) However, a daily bulletin was posted for all inmates on or about December 21, 2004, which clarified WCI's policy relating to fantasy games and activities such as Dungeons & Dragons. This bulletin provided that:

> Inmates are not allowed to engage in or possess written or printed materials that details the rules, codes, rosters and dogma of fantasy games & activities. Examples would be "Dungeons and Dragons", "Fantasy Sports Games" etc. These activities may create a risk of serious disruption to the institution or community.

(DPFOF ¶ 58.)

In applying the factors to WCI's policy regarding the role-playing material, the undisputed evidence is that Bruce Muraski, a Security Supervisor 2 at WCI who is also the Disruptive Group Coordinator for WCI, instituted the policy banning role-playing publications and activities at WCI because such material has the potential to promote gang mentality among its participants and compromises the rehabilitation process. Mr. Muraski stated that he has security related concerns with inmates participating in Dungeons & Dragons and other role-playing activities

35

because the rules of the game, including providing one person (the "Dungeon Master") with a leadership role to master game rules, mimic the organization of a gang. In addition, he testified that one aspect of Dungeons & Dragons is to evade and escape from made-up situations which can lead to an inmate's interest in escaping from the correctional environment. He also has found that this type of game promotes competitive hostility, violence and addictive escape behavior which interferes with the inmate's rehabilitation and the effects of positive programming. In response, plaintiff argues that the policy (and Mr. Muraski's justifications for the policy) are an exaggerated response to a nonexistent danger.

The courts do not have the knowledge or the expertise of prison officials, and the judiciary is ill-equipped to handle the difficult and intricate problems of prison management. *Thornburgh v. Abbott*, 490 U.S. 401, 407-408 (1989). As a result, prison officials are accorded wide-ranging deference in adopting policies that are needed to preserve internal order and security. *Caldwell,* 790 F.2d at 596 (citing *Hewitt v. Helms*, 459 U.S. 460, 474 (1983); *Bell v. Wolfish*, 441 U.S. 520, 547-48 (1979); and *Pell*, 417 U.S. at 827). Hence, the court should not substitute its judgment for theirs unless there is "substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations." *Caldwell*, 790 F.2d at 596 (quoting *Pell*, 417 U.S. at 827).

In the case at hand, the undisputed evidence is that Mr. Muraski, with many years of experience as a security and safety specialist in the correctional setting, and a certified gang expert, believed the role-playing games posed a threat within the

Case 2:05-cv-01040-JPS   Filed 07/31/07   Page 36 of 47   Document 137

institution. Mr. Muraski acknowledged that he was unable to identify an incident of violence or disruptive behavior associated with role-playing games. This admission, without more, does not cast doubt on the validity of the reasons underlying the policy that were offered by Mr. Muraski since the courts have held that "[s]ome latitude in anticipating the probable consequences of allowing certain speech in a prison environment is essential to the proper discharge of an administrator's duty." *Thornburgh*, 490 U.S. at 408 (quoting *Procunier v. Martinez*, 416 U.S. 396, 414 (1974)). "Prison administrators need not wait until violence occurs before implementing prison regulations banning conduct which they believe will compromise the safety and security of the institution." *Farmer v. Dormire*, 2005 WL 2372146 (W.D. Mo. 2005).

It is beyond dispute that safety and security are legitimate penological objectives. *See Overton v. Bazzetta*, 539 U.S. 126, 127 (2003). The prevention of gang activity and fostering rehabilitation are integral to maintaining the security and safety of correctional institutions and are also legitimate penological interests. *See Beard v. Banks,* ___ U.S. ___, ___, 126 S. Ct. 2572, 2588 (2006) ("[r]ehabilitation is undoubtedly a legitimate penological interest."); *Overton,* 539 U.S. at 129 (same); *David K. v. Lane*, 839 F.2d 1265, 1277 (7th Cir. 1988); *Rios v. Lane*, 812 F.2d 1032, 1037 (7th Cir. 1987) (prison officials have a compelling interest in implementing policies designed to combat the threat to institutional security posed by organized gang activity); *George v. Smith*, 467 F. Supp. 2d 906, 920 (W.D. Wis. 2006) (same).

The plaintiff has not come forward with any admissible evidence showing that defendants' concern for safety and security, preventing gang activity and fostering rehabilitation is not legitimate and honestly held, that the limitations on role-playing games and related material is not rationally related to those goals or that the policy is an exaggerated response to defendants' legitimate concern.[22] Plaintiff and the other AFFIANT who testified that the defendants' concerns were exaggerated and unfounded have no expertise or credentials to testify as to how role-playing games affect the safety and security of a prison or as to whether such games increase gang mentality or interfere with an inmate's rehabilitation.[23] In the absence of such expertise, the plaintiff is unable to demonstrate that the ban on role-playing games was not related to legitimate penological objectives.

Other courts have found it rational for prison officials to fear that inmate exposure to role-playing games may lead inmates to become absorbed with their roles in such games, lose touch with reality and become violent. *Menser v. Long*, No. 96-1593 (E.D. Mo. 1999) (unpublished); *see also Bahrampour v. Lampert*, 356 F.3d 969 (9th Cir. 2004) (prohibition against role-playing materials is reasonably related to legitimate penological interests); *Jacquay v. Maynard*, 47 F.3d 1178 (10th Cir. 1995) (unpublished) (complete ban on role-playing material is reasonably

---

[22] The plaintiff actually concedes that the goals underlying the policy are legitimate penological objectives. *(See* Pl.'s Br. in Resp. 11 and 17.)

[23]On January 29, 2007, a document captioned "Amicus Curiae of the Committee for the Advancement of Role-Playing Games (CAR-PGa)" was filed with the court by Paul Cardwell. The document was unsigned and submitted without leave of court, and therefore, it will be disregarded by the court.

related to prison safety). Thus, the policy banning role-playing games and related material satisfies the first *Turner* standard.

As to the second *Turner* factor, the defendants concede that no other avenues remain open for inmates at WCI to participate in Dungeons & Dragons or other role-playing fantasy games or related activities. Nevertheless, courts have acknowledged that the *Turner* factors tend to blend together and are not meant to be weighed according to any precise formula. *Waterman v. Farmer*, 183 F.3d 208 (3d Cir. 1999); *Amatel v. Reno*, 156 F.3d 192 (D.C. Cir. 1998); *George*, 467 F. Supp. 2d at 917; *Aiello v. Litscher*, 104 F. Supp. 2d 1068, 1075 (W.D. Wis. 2000). In other words, a finding that no alternative means exist for exercising the right asserted is not conclusive to finding that the challenged regulation is unreasonable.[24] *Overton*, 539 U.S. at 135.

The undisputed testimony of Mr. Muraski is also relevant in assessing the third *Turner* factor. According to Mr. Muraski's testimony, accommodating the plaintiff's request to keep or receive his role-playing materials will have a detrimental effect on other inmates, staff and the institution because such material has the potential to encourage gang mentality among its participants and to lead to competitive hostility, violence and addictive escape behavior. Such potential detrimental conduct could compromise the inmate's rehabilitation efforts and it could result in violence against

---

[24] The plaintiff does not suggest that all avenues for reading and game playing have been foreclosed by the policy at issue in this case. He contends only that he can't exercise the asserted right to possess publications and other material related to role-playing fantasy games. At least one court has found that, in such instances, the second *Turner* factor actually weighs in favor of the defendants. *See Farmer*, 2005 WL 2372146 *4 (where plaintiffs had numerous other games available to them at the prison such as chess, checkers and Risk, "other avenues" remained available for the exercise of the asserted right to engage in role-playing games).

other inmates and guards. As noted by the Supreme Court, "[w]hen accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." *Turner*, 482 U.S. at 90. Certainly, the potential for violence and an increase in gang activity would have a significant ripple effect within the institution.

The plaintiff argues that accommodating his request will not have any adverse effects as demonstrated by the fact that there are well run prisons in the state of Wisconsin that allow role-playing publications to be received. For example, he contends that the Wisconsin Secure Program Facility (WSPF) allows inmates to receive role-playing publications. The problem with plaintiff's argument is that the documents upon which he relies to support his contention–various invoices or order forms–show only that an inmate at WSPF ordered various role-playing publications while incarcerated. *(See* Pl.'s Ex. 33 (Docket #79)). The plaintiff has not identified any evidence which shows that WSPF has a policy of allowing inmates to receive role-playing publications or that otherwise calls into question Mr. Muraski's expert testimony regarding the possible consequences of accommodating the plaintiff's asserted right. Therefore, the third *Turner* factor weighs in favor of the defendants.

Lastly, plaintiff argues that there are two alternatives to banning role-playing activities and the possession of role-playing materials: "1) enforce existing prison policies, gangs were prohibited before the ban; 2) they could allow inmates to possess the publications but prohibit the publications from being used as a game."

(Pl.'s Br. in Resp. 16-17.)  The plaintiff's first suggestion is not really an "alternative," since there is no evidence that existing policies prohibiting gangs weren't being enforced in the first place.  Furthermore, the challenged policy concerning the ban on role-playing activities and material was put in place, in part, to further these existing prison policies against gangs.  As a result, the challenged prohibition against role-playing activities and material is part of those existing prison policies.

The plaintiff's second proffered alternative is inadequate because the prison's overall concerns of safety and security are not limited to role-playing *games*. According to the evidence in the record, role-playing activities *and* publications pose concerns over an inmate's obsession with violence and escaping from the correctional environment.  Moreover, the plaintiff has not articulated how it would be easier for guards and other staff members to enforce a policy which allows inmates to possess role-playing publications but prohibits them from using the material as part of a role-playing game.  Thus, the plaintiff has not identified any obvious, easy alternatives that adequately address all of the prisons safety and security concerns.

In sum, the court finds that, based upon the undisputed material facts, and after applying the *Turner* factors, the plaintiff has failed to demonstrate that there is a genuine issue of material fact as to whether the policy at issue in this case was reasonably related to the legitimate penological interests of maintaining safety and

Case 2:05-cv-01040-JPS   Filed 07/31/07   Page 41 of 47   Document 137

security and curbing gang activity. Therefore, the defendants are entitled to summary judgment on plaintiff's First Amendment claims.[25]

## C. Fourteenth Amendment Equal Protection Claim

In his unverified complaint, the plaintiff alleges that his Fourteenth Amendment equal protection rights are being violated because prison regulation Wis. Admin. Code § DOC 309.05 is not being applied equally to all inmates.[26] Specifically, the

---

[25]In his brief, the plaintiff argues that, with respect to his manuscript, the policy banning inmates from possessing role-playing material must be analyzed under the standard set forth by the Supreme Court in *Procunier v. Martinez*, 416 U.S. 396, 415 (1974). However, *Martinez* is limited to regulations concerning outgoing correspondence. *Thornburgh*, 490 U.S. at 413-14. Contrary to plaintiff's assertion, the *Martinez* standard does not apply in this case because there are no allegations suggesting that plaintiff's outgoing mail was censored. Rather, his claim is that his unfinished manuscript was seized, along with other material, as contraband. (Thereafter, plaintiff actually sent the contraband material out of the institution.) Further, plaintiff's citation to the unpublished decision in *Pursley v. DeTella*, 210 F. 3d 375 (7th Cir. 2000) as support for his argument is improper because it violates Seventh Circuit Rule 32.1 which prohibits citations to unpublished orders of the appellate court issued before January 1, 2007.

[26] Wis. Admin Code § DOC 309.05 (Publications) provides:

(1)     The department shall facilitate inmate readings of publications, including books, magazines, newspapers, and pamphlets.

(2)     Section DOC 309.04 applies to receipt of publications. In addition, the department shall restrict receipt of publications by inmates as follows:

    (a)     Inmate may only receive publications directly from the publisher or other recognized commercial sources in their packages.

    (b)     Inmates may not receive publications that:

    1.     Teach or advocate violence or hatred and present a danger to institutional security and order.
    2.     Teach or advocate behavior that violates the law of the state or the United States or the rules of the department.
    3.     Teach or describe the manufacture or use of weapons, explosives, drugs, or intoxicating substances.
    4.     Are injurious as defined in s. DOC 309.04 (4)(c)(8).
    5.     Teach or describe the manufacture or use of devices that create a substantial danger of physical harm to self or others.

    (c).     The department may not prohibit a publication on the basis of its appeal to a particular ethnic, racial, or religious audience or because of the political beliefs expressed therein.

(3)     If a publication is not delivered pursuant to sub. (2), the department shall notify the inmate and sender. The inmate may appeal the decision to the warden within 10 days of the decision.

plaintiff alleged that "[s]everal inmates are still to this day receiving role-playing publications identical to those taken from the plaintiff, or substantially the same. Other inmates who had the same publications still possess them, and have not been bothered or harassed about them." (Complaint at ¶ 59.)

The purpose of the Equal Protection Clause is to "secure every person with the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). As recognized in the screening order dated January 20, 2006, plaintiff's equal protection claim is properly characterized as a "class of one" claim. "Class of one" equal protection claims arise without regard to protected-class status where the plaintiff "has been intentionally treated differently from others similarly situated and . . . there is no rational basis for the difference in treatment." *Id.*

The Seventh Circuit has recognized "class of one" claims in the equal protection context, although it has also " 'acknowledged that it is difficult to succeed with such a claim.' " *Maulding Dev., LLC v. City of Springfield*, 453 F.3d 967, 969-70 (7th Cir. 2006) (quoting *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004) (other citations omitted by Seventh Circuit)), *cert. denied* --- U.S. ----, 127 S. Ct. 944 (2007). To prevail on a "class of one" claim under the Equal Protection Clause of the Fourteenth Amendment, the plaintiff "must show (1) he has been intentionally treated differently from others similarly situated; and (2) there is no rational basis for the difference in treatment or the cause of the differential

Case 2:05-cv-01040-JPS   Filed 07/31/07   Page 43 of 47   Document 137

treatment is a 'totally illegitimate animus' toward [him] by the [defendants]." *Id.* at 970

(citing *Olech*, 528 U.S. at 564; *Nevel v. Vill. of Schaumburg*, 297 F.3d 673, 681

(7th Cir. 2002)).  The class of one plaintiff "bears the burden of proving that he has

suffered intentional, irrational and arbitrary discrimination."  *Bell v. Duperrault*,

367 F.3d 703, 707 (7th Cir. 2004) (citing *Olech*, 528 U.S. at 564-65).  The plaintiff

must "eliminate any reasonably conceivable state of facts that could provide a

rational basis for the classification."  *Id.* at 708 (quoting *Discovery House, Inc. v.*

*Consolidated City of Indianapolis*, 319 F.3d 277, 282-83 (7th Cir.2003)).

The defendants argue that they are entitled to summary judgment on this

claim because the plaintiff has failed to present evidence showing that the

defendants intentionally treated him differently from other inmates when applying

Wis. Admin. Code § DOC 309.05, or that the defendants treated him differently due

to a "totally illegitimate animus toward the plaintiff by the defendants." (Defs.' Br. in

Supp. of Summ. J. 20.)  By its terms, Wis. Admin. Code § DOC 309.05 applies to all

inmates.  The defendants have offered the testimony of Mr. Muraski to establish that,

in accordance with § DOC 309.05, no inmate at WCI is allowed to engage in or

possess written or printed materials that details the rules, codes, rosters and dogma

of fantasy games and activities such as Dungeons & Dragons or fantasy sports

games.  (DIFF. ¶ 61.)

The plaintiff attempts to prove unequal treatment in the application of

Wis. Admin. Code § DOC 309.05 by arguing that a fellow inmate, James Livingston,

was allowed to order and retain various role-playing publications despite the policy

banning the possession of written or printed materials that relate to fantasy or role-playing games and activities. Specifically, Mr. Livingston testified that 10 publications concerning role-playing games "were approved by property staff, and in [his] possession at Waupun. After Waupun's publications policy was changed the books listed below were sent to property staff and returned to [him]." (Aff. of James Livingston ¶ 2-3.)[27]

The problem with the plaintiff's argument is that he fails to show that he was *intentionally* treated differently from Mr. Livingston. The defendants provided evidence that if certain inmates were allowed by property staff to retain role-playing publications, it was in error, and that not all staff have training and expertise in identifying unsanctioned, non-allowed materials such as role-playing or fantasy game materials. The plaintiff has provided no evidence to counter this testimony. In the absence of such evidence, no reasonable jury could conclude that the plaintiff was intentionally (as opposed to mistakenly) treated differently than Mr. Livingston. In addition, the plaintiff has failed to produce evidence that the allegedly disparate treatment he received was motivated by ill will, vindictiveness, or some other illegitimate state objective.

The plaintiff also maintains that disparate treatment is evidenced by the fact that the library has many books with fictional maps that are "identical for all practical purposes" to the maps that were seized from him. As previously stated, the Equal Protection Clause guarantees that "all persons similarly situated should be treated

---

[27] Mr. Livingston's affidavit does not support the plaintiff's contention that the publications were seized during a room search and returned to Mr. Livingston "for a third time." (Pl.'s Br. in Resp. 23.)

Case 2:05-cv-01040-JPS    Filed 07/31/07    Page 45 of 47    Document 137

alike." *City of Cleburne, Tex. v. Cleburne Living Center*, 473 U.S. 432, 439 (1985).

Moreover, "[i]t is clear that similarly situated individuals must be very similar indeed."

*McDonald*, 371 F.3d at 1002; *see also Purze v. Vill. of Winthrop Harbor*, 286 F.3d

452, 455 (7th Cir. 2002) (holding that in order to be considered "similarly situated,"

comparators must be "prima facie identical in all relevant respects").  It goes without

saying that the prison library and Mr. Singer are not "similarly situated" persons.

Based on the above, the court finds that the plaintiff has failed to raise a triable

issue as to whether he was intentionally treated differently than other similarly

situated persons in the application of Wis. Admin. Code. § DOC 309.05.  Therefore,

the defendants are entitled to summary judgment on this claim.[28]

## D. Qualified Immunity

As a final matter, defendants contend that they are entitled to qualified

immunity with respect to plaintiffs' claims.  Because I have found that defendants'

are entitled to summary judgment with respect to each of plaintiff's constitutional

claims, it is not necessary to address their qualified immunity argument.  *Estate of

Phillips v. City of Milwaukee*, 123 F.3d 586, 597(7th Cir. 1997)(when a court

determines in a § 1983 case that no constitutional violation occurred, it is

unnecessary to consider whether defendants are entitled to qualified immunity).

---

[28]In his responsive brief, the plaintiff advances an overbreadth challenge to Wis. Admin. Code § DOC 309.05.  The defendants correctly note that the court did not read plaintiff's complaint as alleging such a claim in its screening order dated January 20, 2006, and the plaintiff did not take any steps thereafter to correct the court's reading or to include such a claim.  Moreover, the court doubts the viability of such a claim given the limitation on the overbreadth doctrine as applied to prison regulations.  *See Koutnik v. Brown*, 456 F.3d 777, 783 (7th Cir. 2006) ("[w]hatever scope overbreadth analysis has in criminal prosecutions . . . it has little or none in civil litigation dealing with prison's internal operations ") (citing *Borzych v. Frank*, 439 F. 3d 388, 391 (7th Cir. 2006).  For these reasons, the court will not address plaintiff's overbreadth arguments.

Accordingly,

**IT IS ORDERED** that the plaintiff's "Motion to Strike the Affidavit of Bruce Muraski" be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that the plaintiff's "Motion to Strike Exhibit 1010" be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that the defendants' "Motion to Strike Plaintiff's Motion for Partial Summary Judgment" be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that the defendants' "Motion for Summary Judgment" be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that the plaintiff's "Motion for Partial Summary Judgment" be and the same is hereby **DENIED** as moot; and,

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED** with prejudice.

The clerk of court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this __31st__ day of July, 2007.

BY THE COURT:

_s/ J. P. Stadtmueller_____
J. P. Stadtmueller
U.S. District Judge